UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| C.A., the Student; and W.A., the Student's Parent, | Case No. 3:19-cv-00272 |
| Plaintiffs, | |
| | Judge William L. Campbell, Jr. |
| v. | Magistrate Judge Alistair E. Newbern |
| WILLIAMSON COUNTY BOARD OF EDUCATION, | |
| Defendant. | |

To:     The Honorable William L. Campbell, Jr., District Judge

## REPORT AND RECOMMENDATION

C.A., by and through his parent W.A., brings this action under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–82, appealing a state administrative law judge's (ALJ) findings that (1) Defendant the Williamson County Board of Education (WCBOE) offered C.A. a "free appropriate public education" (FAPE) as required by the IDEA for the 2015–2016 and 2016–2017 school years; (2) Currey Ingram Academy (CIA), a private school, was not an appropriate placement for C.A. under the IDEA; and (3) C.A.'s parents were not entitled to reimbursement for C.A.'s CIA tuition, private psychotherapy and counseling services, private vision therapy, private occupational therapy (OT), or private educational consulting services. (Doc. Nos. 1, 1-2.) Before the Court is C.A. and W.A.'s revised motion for judgment on the administrative record. (Doc. No. 50.) WCBOE has responded in opposition (Doc. No. 49), and C.A. and W.A. have filed a reply (Doc. No. 51). Considering the parties' arguments and the administrative record as a whole, and for the reasons that follow, the Magistrate Judge will

recommend that C.A. and W.A.'s revised motion for judgment on the administrative record be denied.

## I.    Background

### A.    The IDEA

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A).[1] The IDEA defines a FAPE as:

> special education and related services that—
>
>> (A) have been provided at public expense, under public supervision and direction, and without charge;
>>
>> (B) meet the standards of the State educational agency;
>>
>> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>>
>> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

*Id.* § 1401(9)(A)–(D). In exchange for federal funding, the IDEA requires states to identify, locate, and evaluate "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services[.]" *Id.* § 1412(a)(3)(A). "[S]chool districts receiving funds under the IDEA are required to establish an [individualized education program (IEP)] for each child with a disability." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004). "[T]he IEP must contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating

---

[1]    All citations to the U.S. Code and Code of Federal Regulations herein refer to the current versions. The relevant federal statutes and regulations have not substantively changed since the events at issue in this action occurred.

the child's progress." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 763 (6th Cir. 2001); *see also* 20 U.S.C. § 1414(d)(1)(A) (defining requirements for IEPs).

The IDEA requires that a student's IEP be implemented "so as to educate the disabled student in the 'least restrictive environment' (LRE) possible[.]" *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 788 (6th Cir. 2018) (quoting 20 U.S.C. § 1412(a)(5)). This means that, "[t]o the maximum extent appropriate, children with disabilities . . . [must be] educated with children who are not disabled" and may be educated separately "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). IDEA regulations further provide that, "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled[.]" 34 C.F.R. § 300.116(c). The Sixth Circuit has recognized that there are exceptions to the IDEA's preference for mainstreaming children with disabilities "when: (1) the student would not benefit from regular education; (2) any regular-class benefits would be far outweighed by the benefits of special education; or (3) the student would be a disruptive force in the regular class." *L.H.*, 900 F.3d at 789; *see also* 34 C.F.R. § 300.116(d) ("In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs[.]").

The IDEA provides that "parents who disagree with the appropriateness of an IEP can seek relief" by filing "a complaint to the school district, followed by a due process hearing at which parents are able to voice their concerns to an [independent hearing officer] of the state educational agency, as determined by state law." *Knable*, 238 F.3d at 763; *see also* 20 U.S.C. § 1415 (establishing procedural safeguards, including right to file a complaint and right to a due process hearing). Any party aggrieved by the state educational agency's final decision may file a civil

action in federal district court. 20 U.S.C. § 1415(i)(2)(A); *see also Knable*, 238 F.3d at 763. The IDEA empowers courts to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).

## B. Factual Background

C.A. was born in May 2000, and, at all times relevant to this action, resided in Williamson County, Tennessee. C.A. began seeing psychiatrist Dr. Richard Navarre in August 2011. (Doc. No. 43-15, PageID# 4233.) Dr. Navarre diagnosed C.A. with anxiety disorder with symptoms of post-traumatic stress disorder (PTSD), depression, oppositional defiant disorder, attention deficit hyperactivity disorder (ADHD), and mood disorder, and treated C.A. with prescription medications. (*Id.* at PageID# 4233, 4234, 4236, 4238.) In November 2012, C.A. was hospitalized at Vanderbilt Psychiatric Hospital in Nashville, Tennessee, "after an angry outburst in a restaurant during which he banged his head against the window and threatened to harm himself." (Doc. No. 43-10, PageID# 2979.) Vanderbilt discharged C.A. after six days. (*Id.* at PageID# 2960)

In the summer of 2013, WCBOE evaluated C.A., identified him as eligible for special education services under the IDEA, and assigned him an eligibility classification of other health impairment (OHI).[2] (Doc. No. 43-4, PageID# 1599–1600; Doc. No. 43-16, PageID# 4767.) C.A.

---

[2]      The relevant IDEA regulations, which have not changed since 2013, define OHI as follows:

(9) Other health impairment means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—

(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and

was then a middle school student at Brentwood Academy, a private school in Williamson County. (Doc. No. 43-1, PageID# 912.) C.A. continued his enrollment at Brentwood Academy for the 2013–2014 school year, which was his eighth-grade year. (*Id.*)

In August 2014, C.A.'s parents enrolled him in ninth grade at CIA for the 2014–2015 school year. (Doc. No. 43-1, PageID# 914; Doc. No. 43-4, PageID# 1655.) CIA is a private school in Williamson County designed to educate students with learning differences. (Doc. No. 43-3, PageID# 1368.) A typical class size at CIA is six to eight students, with some classes as small as two to three students. (*Id.*) CIA employs a school counselor, who helps students with their social and emotional needs, and an occupational therapist, among other support staff. (*Id.* at PageID# 1372–73.) CIA also has a mentoring program that students participate in for thirty minutes each day. (*Id.* at PageID# 1369, 1373–75.)

As part of its curriculum, CIA develops individualized learning plans (ILPs) for each enrolled student. (*Id.* at PageID# 1375; Doc. No. 43-12, PageID# 3464.) C.A.'s ILP for the 2014–

---

(ii) Adversely affects a child's educational performance.

34 C.F.R. § 300.8(c)(9)(i)–(ii).

2015 CIA school year included the following accommodations and modifications for his academic work and testing:

| | |
|---|---|
| ☒ Extended time (100% or more if needed) | ☐ Use of scribe |
| ☒ Small group testing | ☒ Preferential seating |
| ☒ Short breaks during test | ☒ Use of laptop |
| ☒ Multi-day testing | ☒ Use of calculator |
| ☒ Structured environment | ☒ Spell check |
| ☒ Instruction paced according to student's rate of learning | ☒ Grammar check |
| ☒ Small class ratio | ☒ Voice recognition software |
| ☒ Reduced workload for mastery | ☒ Audio books, texts, materials for instruction |
| ☒ Audio/video classroom instruction recording | ☒ Limit copying from board |
| ☒ Agenda/planner iCal utilization | ☒ Supplemental notes |
| ☒ Advisory organizational support and instruction | ☒ Sensory strategies per class |
| ☒ Time management instruction | ☒ Scaffolding for note taking |
| ☒ Multi-sensory and multi-modality instruction | ☒ Repetition/Re-teaching |
| ☒ Wait time given in class for effective processing and understanding | ☐ Peer mentoring |
| ☒ Use of alternative assessment techniques to match student's learning style | ☒ Math support class |
| ☐ Individual testing | ☐ SLP |
| ☒ Selective reading | ☐ OT |
| ☐ Tests/instructional materials read orally | ☐ Other |
| ☒ Write in test booklet | |
| ☒ Large print edition/answer sheet | |

(Doc. No. 43-12, PageID# 3660.) C.A.'s ILP also included goals for each class, and his teachers evaluated his progress toward those goals each academic quarter. (*Id.* at PageID# 3661–71.)

### 1. 2015–2016 IEP Development

In the spring of 2015, W.A. invoked the IDEA and asked WCBOE to develop an IEP for C.A. for the 2015–2016 school year. (Doc. No. 43-16, PageID# 4276.) W.A. provided WCBOE with many of C.A.'s school and medical records (Doc. No. 43-5, PageID# 1938–39), and WCBOE convened the first IEP meeting on May 11, 2015 (Doc. No. 43-14, PageID# 3890). W.A. attended the meeting, as did Director of Student Support Services for Williamson County Schools (WCS) Carol Hendlmyer; WCS Student Support Services Specialist Maria Griego; WCS Occupational Therapist Barbara Herman; Brentwood High School (BHS) Assistant Principal Kate Burgun; BHS School Psychologist Wendy Melson; BHS Department Chair of Special Education Phyllis Williamson; BHS special education teacher Anne Louise Spangler; and BHS math teacher Rachel Kernoodle. (*Id.* at PageID# 3890, 3892.) Hendlmyer brought a draft IEP to the May 11, 2015

meeting that was based on C.A. attending BHS, the WCBOE school that C.A. was zoned to attend. (Doc. No. 43-4, PageID# 1675; Doc. No. 43-6, PageID# 1989, 2048; Doc. No. 43-14, PageID# 3901.) Notes from the first IEP meeting reflect that W.A. requested that C.A. attend CIA and that WCBOE reimburse the cost. (Doc. No. 43-14, PageID# 3902, 3910–11.) However, during the next meeting on May 13, 2015, W.A. clarified that she did not make that request and that it was Hendlmyer who stated during the May 11 meeting that W.A. was requesting placement at CIA. (Audio Recording: IEP Meeting (May 13, 2015) (on file with the Court).)

WCBOE held additional IEP meetings on May 15, May 18, June 12, and July 7, 2015. (Doc. No. 43-16, PageID# 4370, 4415, 4460, 4503.) W.A. attended and participated in each meeting. (*Id.*) Notes from the May 13, May 15, and May 18 meetings reflect that the team continued to discuss C.A.'s current performance levels, goals, and needed services while assuming that C.A.'s IEP would be implemented at BHS. (Doc. No. 43-16.) Melson contacted some of C.A.'s medical providers to obtain additional information, including Dr. Navarre; C.A's pediatrician, Dr. Catherine Bottoms, and C.A.'s vision therapist from sixth through eighth grade, Amy Clark. (Doc. No. 43-2, PageID# 1162; Doc. No. 43-6, PageID# 2079; Doc. No. 43-16, PageID# 4332, 4378–81.) Melson also contacted CIA upper school division head Shannon Elders regarding C.A.'s performance at that school (Doc. No. 43-7, PageID# 2228–32) and conducted an individual assessment screening report for C.A. to help the IEP team update C.A.'s performance levels from his 2013 initial eligibility assessment (Doc. No. 43-6, PageID# 2201–05; Doc. No. 43-11, PageID# 3200–10).

WCBOE presented W.A. with the final proposed 2015–2016 IEP at the July 7, 2015 meeting. (Doc. No. 43-8, PageID# 2467.) The IEP listed OHI as C.A.'s primary disability, stated that C.A. did not have a secondary disability, and stated that C.A. would be due for reevaluation

of his eligibility under the IDEA on July 24, 2016. (*Id.*) With respect to C.A.'s present levels of performance, the IEP identified two areas in which C.A. was exceptional, i.e. not within normal ranges, and eleven areas in which C.A. was not exceptional. (*Id.* at PageID# 2471–82.) C.A.'s exceptional areas were vocational skills and social/emotional behavior (*id.* at PageID# 2475–76, 2481); his non-exceptional areas were basic reading skills, reading fluency, reading comprehension, math calculation, math problem solving, written expression, adaptive behavior, communication, fine motor skills, gross motor skills, and transition (*id.* at PageID# 2471–82). The IEP team checked boxes indicating that C.A.'s "behavior impede[s] his[ ] learning or that of others" and that the IEP "addressed the student's behavior" through "[a]ccommodations" and "[g]oals and [o]bjectives[.]" (*Id.* at PageID# 2483.) The IEP team stated that C.A. "demonstrate[d] cognitive processing deficits that impact his[ ] classroom performance and warrant consideration in the development of the IEP (i.e. accommodation use)[,]" and offered the following explanation:

> In a report completed by The Diagnostic Center at Currey Ingram in April of 2014, [C.A.'s] Processing Speed Index score on the WISC-IV falls in the low average range and is statistically and clinically significantly lower than his other index scores. [C.A.'s] performance on the processing speed tasks on the WISC-IV and on the Visual Matching subtest on the WJ-III Cog was likely impacted by his visual processing issues, visual-motor integration weaknesses, and his weaker fine motor skills. Deficits in processing speed may contribute to [C.A.'s] performance on timed tasks, such as Reading Fluency, Math Fluency and Writing Fluency. Processing speed is the ability to process simple or routine visual information quickly and effectively and to perform operations based on that information. When information is processed slowly, competing stimuli in immediate awareness can interfere with the ability to maintain focused attention and concentration on the task at hand. Due to this processing deficit, [C.A.] may find tasks that involve multiple, complex processes or require multiple steps for completion particularly confusing and frustrating. Completing tests and assignments within the usual time constraints may also be difficult for him, even if he has adequate skills and knowledge.

(*Id.* at PageID# 2483–84).

The 2015–2016 IEP included five goals, two related to transition-vocational skills and three related to social/emotional behavior. (*Id.* at PageID# 2488.) It stated that C.A. would be "provided

with a school laptop" as a "[s]upplementary [a]id[ ]/[s]ervice[ ] and [s]upport" (*id.* at PageID# 2489) and custom accommodations in the following classes: English/language arts; math; science; social studies; foreign language; lifetime wellness; and directed study (*id.* at PageID# 2490–93). Those accommodations included, among other things, opportunities to correct or retake failed assignments; opportunities to take tests in a flexible setting and with extra time if requested; extra time to process instructions; extra white space on assignments and tests; opportunities to take short breaks during classroom instruction and tests if requested; and copies of any notes or materials to be copied from the board. (*Id.* at PageID# 490–93.)

Lifetime wellness and directed study were the only "Direct Special Education" that the proposed IEP offered C.A. (*Id.* at PageID# 2497.) Lifetime wellness is a health and physical education class required for graduation from BHS. (Doc. No. 43-6, PageID# 2001, 2024.) The 2015–2016 IEP provided for C.A. to have a paraprofessional in his lifetime wellness class because of the large number of students enrolled. (Doc. No. 43-4, PageID# 1645; Doc. No. 43-16, PageID# 4499; Audio recording: IEP Meeting Part I (June 12, 2015) (on file with the Court).) Directed study is a study hall supervised by a special education teacher. (Doc. No. 43-6, PageID# 1997, 2144.)

The IEP team determined that C.A.'s IEP could be implemented at BHS in accordance with the IDEA's LRE provisions. (Doc. No. 43-5, PageID# 1943; Doc. No. 43-16, PageID# 4500.) W.A. refused to sign the 2015–2016 IEP and re-enrolled C.A. at CIA for his tenth-grade year. (Doc. No. 43-4, PageID# 1635–36; Doc. No. 43-8, PageID# 2499; Doc. No. 43-14, PageID# 3850–54.)

9

## 2. C.A.'s Behavior During the 2015–2016 School Year

C.A.'s ILP for the 2015–2016 school year at CIA included the following accommodations and modifications for testing and academic work:

| | |
|---|---|
| ☒ Extended time (100% or more if needed) | ☐ Use of scribe |
| ☒ Small group testing | ☒ Preferential seating |
| ☒ Short breaks during test | ☒ Use of laptop |
| ☒ Multi-day testing | ☒ Use of calculator |
| ☒ Structured environment | ☒ Spell check |
| ☒ Instruction paced according to student's rate of learning | ☒ Grammar check |
| ☒ Small class ratio | ☒ Voice recognition software |
| ☒ Reduced workload for mastery | ☒ Audio books, texts, materials for instruction |
| ☒ Audio/video classroom instruction recording | ☒ Limit copying from board |
| ☒ Agenda/planner iCal utilization | ☒ Supplemental notes |
| ☒ Advisory organizational support and instruction | ☐ Sensory strategies per class |
| ☒ Time management instruction | ☒ Scaffolding for note taking |
| ☒ Multi-sensory and multi-modality instruction | ☒ Repetition/Re-teaching |
| ☒ Wait time given in class for effective processing and understanding | ☐ Peer mentoring |
| ☒ Use of alternative assessment techniques to match student's learning style | ☐ Math support class |
| ☐ Individual testing | ☐ SLP |
| ☒ Selective reading | ☐ OT |
| ☐ Tests/instructional materials read orally | ☐ Other |
| ☒ Write in test booklet | |
| ☒ Large print edition/answer sheet | |

Exhibit No. 23

(Doc. No. 43-10, PageID# 3129.) Once again, C.A.'s ILP included individualized goals for each class and his teachers evaluated his progress toward these goals quarterly. (*Id.* at PageID# 3151–57, 3159–65.) CIA also provided C.A. with OT during the 2015–2016 school year after W.A. sent CIA the results of a September 2015 vision evaluation by Dr. Christina Danley and an October 2015 OT evaluation recommended by Dr. Danley. (Doc. No. 43-3, PageID# 1386–87; Doc. No. 43-14, PageID# 4026.) W.A. also sent the vision evaluation and OT evaluation to the WCBOE IEP team. (Doc. No. 43-5, PageID# 1942–43, 1946–47; Doc. No. 43-14, PageID# 3932–42.) In addition to the OT C.A. received at CIA, Dr. Danley provided C.A. with private vision therapy from September 2015 until March or April 2016. (Doc. No. 43-2, PageID# 1102.)

In the fall of 2015, C.A. disrupted a CIA math competition trip by flooding the hotel bathroom, doing cannonballs into the bathtub, and keeping his roommates up until 3:00 a.m. (Doc. No. 43-9, PageID# 2810.) He served after-school detention for three days, was barred from attending future math trips, and may also have served in-school suspension. (Doc. No. 43-3, PageID# 1404–07, 1417; Doc. No. 43-5, PageID# 1744, 1775; Doc. No. 43-9, PageID# 2810.) In the spring of 2016, C.A. began struggling academically in his chemistry class. (Doc. No. 43-4, PageID# 1695; Doc. No. 43-8, PageID# 2667; Doc. No. 43-16, PageID# 4747.) W.A. testified "that struggling in academics is a trigger for [C.A.] for self-harm and mood instability" and that C.A.'s struggle with chemistry "was the start of a much bigger setback for [him]." (Doc. No. 43-4, PageID# 1695.) In March 2016, C.A. engaged in consensual sexual activity with another individual on CIA grounds between school and sports practice. (Doc. No. 43-3, PageID# 1255, 1405; Doc. No. 43-4, PageID# 1695.) As a punishment, his parents no longer allowed C.A. to play on the CIA soccer team. (Doc. No. 43-15, PageID# 4209, 4210.)

C.A. began seeing Dr. Richard Underwood for counseling in March 2016. (Doc. No. 43-11, PageID# 3349.) On Dr. Underwood's and Dr. Navarre's recommendations, C.A. was admitted to Rolling Hills Psychiatric Hospital for inpatient care in April 2016. (Doc. No. 43-11, PageID# 3351.) Dr. Underwood testified that C.A. was a danger to himself and others, that C.A. expressed suicidal ideations to Dr. Underwood, and that C.A. told Dr. Underwood that he had expressed homicidal ideations to W.A. (*Id.* at PageID# 3351–52.) Dr. Navarre agreed that C.A. had expressed homicidal ideations toward his family and was at risk for sexually aggressive behavior. (Doc. No. 43-2, PageID# 1158, 1173, 1196; Doc. No. 43-3, PageID# 1234.) Rolling Hills discharged C.A. after six days (Doc. No. 43-2, PageID# 1154) with a diagnosis of disruptive

mood dysregulation disorder (Doc. No. 43-8, PageID# 2669). C.A. began seeing psychiatrist Dr. Steve Snow shortly after leaving Rolling Hills.[3] (Doc. No. 43-2, PageID# 1158.)

### 3. 2016–2017 IEP Development

W.A. requested that WCBOE develop an IEP for C.A. for the 2016–2017 school year. (Doc. No. 43-5, PageID# 1938; Doc. No. 43-6, PageID# 2097; Doc. No. 43-16, PageID# 4552.) WCBOE convened IEP meetings on July 22, July 26, July 27, and August 3, 2016, all of which W.A. attended. (Doc. No. 43-14, PageID# 3969–70; Doc. No. 43-16, PageID# 4542, 4616, 4673.) The IEP development team for the 2016–2017 school year included Hendlmyer, Herman, Melson, Spangler, BHS Assistant Principal Oceana Sheehan, BHS special education teacher Stacy Poynter, and BHS general education teacher J. Matt Grimes. (Doc. No. 43-16, PageID# 4542, 4616, 4673.)

Spangler testified that the IEP team presented a draft IEP to W.A. at the first meeting on July 22, 2016 (Doc. No. 43-6, PageID# 2098) that "was unchanged from" the 2015–2016 school year (*id.* at PageID# 2101). During the first meeting, W.A. described C.A.'s previous year to the IEP team, including his academic performance and conduct at CIA, occupational therapy, and hospitalization at Rolling Hills. (Doc. No. 43-4, PageID# 1693–94; Doc. No. 43-16, PageID# 4553–55.) W.A. also told the IEP team that, if they could "come up with a really good IEP for [C.A.,]" he would enroll at BHS. (Audio recording: IEP Meeting (July 22, 2016) (on file with the Court); Doc. No. 43-16, PageID# 4556.)

At the July 26, 2016 IEP meeting, the team discussed the need to reevaluate C.A.'s IDEA eligibility classification because his initial eligibility classification from 2013 had expired. (Doc. No. 43-4, PageID# 1600; Doc. No. 43-14, PageID# 3969–75.) In late July and early August 2016,

---

[3]     Dr. Navarre testified that he referred C.A. to Dr. Snow because Dr. Navarre was closing his private psychiatry practice. (Doc. No. 43-3, PageID# 1260.)

Melson conducted a comprehensive psychoeducational assessment of C.A. to help the team determine his eligibility classification. (Doc. No. 43-16, PageID#4746–59.) Melson's assessment stated that C.A. "is currently enrolled at [CIA]; however, his mother has requested the development of an IEP for [C.A.] at [BHS], as she is considering enrollment here." (*Id.* at PageID# 4746.) Melson administered academic achievement testing to C.A. (*id.* at PageID# 4748–51); C.A. and W.A. completed surveys regarding C.A.'s social and emotional functioning (*id.* at PageID# 4751– 54); and Melson compiled input from C.A.'s teachers at CIA, including surveys regarding C.A.'s social and emotional functioning (*id.* at PageID# 4756–59). The team discussed the results of Melson's assessment at the August 3, 2016 IEP meeting and reviewed the elements required to support an emotional disturbance classification under the IDEA and related state regulations. (*Id.* at PageID# 4674–76.) The team also spoke to Dr. Underwood (*id.* at PageID# 4677) and discussed a medical evaluation from Dr. Snow (Doc. No. 43-11, PageID# 3228; Doc. No. 43-14, PageID# 4043).

The team agreed that OHI remained an appropriate eligibility classification for C.A. and discussed whether emotional disturbance was also appropriate. (Doc. No. 43-4, PageID# 1600– 02; Doc. No. 43-7, PageID# 2253–55; Doc. No. 43-16, PageID# 4675, 4745.) The team determined that, while C.A. had been clinically diagnosed with mood disorder and was experiencing symptoms at home, there was not enough evidence to conclude that C.A. was exhibiting significant emotional disturbance at school. (Doc. No. 43-7, PageID# 2278–79; Doc. No. 43-16, PageID# 4675, 4745.) W.A. agreed with the IEP team's decision to classify C.A. with OHI, but disagreed with the team's decision not to classify C.A. with emotional disturbance. (Doc. No. 43-16, PageID# 4745.)

The team presented W.A. with the final proposed 2016–2017 IEP after the August 3, 2016 IEP meeting. (Doc. No. 43-6, PageID# 2107–08.) The final proposed IEP for 2016–2017 was substantially similar to the 2015–2016 IEP with respect to listed disability (Doc. No. 43-8, PageID# 2502); areas of exceptionality (*id.* at PageID# 2506–19); finding that C.A. "demonstrate[d] cognitive processing deficits that impact his[ ] classroom performance and warrant consideration in the development of the IEP" (*id.* at PageID# 2520); and providing C.A. with a school iPad or laptop (*id.* at PageID# 2528). The 2016–2017 IEP included six goals, three related to transition-vocational skills and three related to social/emotional behavior. (*Id.* at PageID# 2526–28.) The 2016–2017 IEP included custom accommodations for C.A. similar to those in the 2015–2016 IEP for English/language arts, math, science, social studies, foreign language, and directed study. (*Id.* at PageID# 2529–32.) It included a new accommodation that, "[w]hen direct instruction has concluded [in academic classes] and students are given the opportunity to work independently, [C.A.'s] teacher will use his/her discretion to direct him to an appropriate work site in order to maximize his opportunities for success." (*Id.* at PageID# 2529.) The team added this accommodation based on the assumption that C.A. would be attending larger classes at BHS. (Audio recording: IEP Meeting (July 22, 2016) (on file with the Court).) The 2016–2017 IEP provided for fifteen-minute OT consultations with Herman up to twenty times per year. (Doc. No. 43-8, PageID# 2535.) It also provided for directed study with a special education teacher five times a week. (*Id.*) Finally, like the 2015–2016 IEP, the 2016–2017 IEP provided that C.A. would attend BHS. (*Id.* at PageID# 2536.) W.A. did not sign the final proposed 2016–2017 IEP and again enrolled C.A. at CIA for the 2016–2017 school year. (Doc. No. 43-15, PageID# 4142–45.)

### C.    Procedural History

#### 1.    Due Process Hearing

On May 11, 2017, W.A. provided WCBOE with a complaint alleging that WCBOE had denied C.A. a FAPE for the 2015–2016 and 2016–2017 school years and requesting reimbursement for the costs of C.A.'s CIA tuition, private psychotherapy and counseling services, private OT, private vision therapy, educational consultant services, and private OT and vision therapy evaluations. (Doc. No. 43-1, PageID# 382–410.) An ALJ in the Tennessee Department of Education Division of Special Education presided over a due process hearing on June 11–15, 2018, and September 11–13, 2018. (Doc. Nos. 43-2–43-7.) W.A. testified at the hearing, as did Dr. Danley, Dr. Navarre, Dr. Underwood, Elders, Hendlmyer, Spangler, and Melson. (Doc. Nos. 43-2–43-7.) Additional witnesses testifying for C.A. included Dr. Christina Noel, Ph.D., and Dr. David Salsberg, Ph.D.; additional witnesses testifying for WCBOE included Dr. Vance Sherwood, Ph.D., and Dr. David John Rostetter, Ed.D. (Doc. Nos. 43-2, 43-3, 43-5, 43-7.)

The ALJ issued a final written decision on February 4, 2019. (Doc. No. 43-1, PageID# 927–58.) The ALJ's findings included that:

- W.A. failed to prove that C.A. was entitled to a reevaluation of his IDEA eligibility prior to the development of his 2015–2016 IEP (Doc. No. 43-1, PageID# 938);

- the IEP team properly determined that C.A. met the criteria for OHI but did not meet the criteria for emotional disturbance when reevaluating C.A.'s eligibility in 2016 (*id.* at PageID# 942);

- W.A. failed to show any substantive harm resulting from alleged procedural violations during the 2016 eligibility reevaluation (*id.* at PageID# 942–43);

- W.A. failed to prove that the 2015–2016 IEP was not reasonably calculated to provide C.A. with an educational benefit (*id.* at PageID# 945–48);

- WCBOE did not predetermine C.A.'s 2015–2016 placement at BHS (*id.* at PageID# 949);

- W.A. failed to prove that the 2016–2017 IEP was not reasonably calculated to provide C.A. with an educational benefit (*id.* at PageID# 949–51);

- WCBOE provided W.A. an opportunity for meaningful participation in the development of C.A.'s 2015–2016 and 2016–2017 IEPs (*id.* at PageID# 951–52);

- W.A. failed to prove that CIA was an appropriate placement under the IDEA (*id.* at PageID# 953–55);

- W.A. failed to prove that reimbursement or future costs for psychotherapy, counseling services, vision therapy, OT, or educational consulting services was appropriate (*id.* at PageID# 955–56); and

- W.A. failed to prove that reimbursement for the costs of private evaluations was appropriate (*id.* at PageID# 956–57).

## 2. Federal District Court Proceedings

W.A. and C.A. initiated this action by filing a complaint under 20 U.S.C. § 1415(i)(2), alleging that the 2015–2016 and 2016–2017 IEPs violated the IDEA; that CIA was an appropriate placement for C.A.; and that C.A.'s parents are entitled to reimbursement for the costs of CIA, psychotherapy and counseling services, vision therapy, OT, and vision therapy and OT evaluations. (Doc. No. 1.) WCBOE filed an answer to the complaint (Doc. No. 14) and a motion to dismiss W.A. as a plaintiff under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that C.A. was no longer a minor and W.A. was not the real party in interest in this action (Doc. Nos. 12, 13). The Court denied WCBOE's motion to dismiss W.A. (Doc. No. 26.)

C.A. and W.A. filed a revised motion for judgment on the administrative record (Doc. No. 50), WCBOE responded in opposition (Doc. No. 49), and C.A. and W.A. filed a reply (Doc. No. 51).[4] C.A. and W.A. argue that the 2015–2016 and 2016–2017 IEPs denied C.A. a FAPE in

---

[4] The Court administratively terminated C.A. and W.A.'s first motion for judgment on the record (Doc. No. 38) and directed the parties to refile the motion and responsive briefs with revised citations to the administrative record. (Doc. No. 44.)

violation of the IDEA because: (1) the IEP team failed to classify C.A. with emotional disturbance; (2) the IEP team predetermined C.A.'s placement at BHS, depriving W.A. of meaningful participation in development of the IEPs; (3) the IEP team inappropriately discounted C.A.'s doctors' opinions that C.A. needed small, self-contained classes; (4) the IEPs failed to include counseling services; and (5) the IEPs failed to include vision therapy. (Doc. No. 50.) C.A. and W.A. further argue that CIA was an appropriate placement for C.A. and that C.A.'s parents are entitled to reimbursement for CIA tuition and vision therapy. (*Id.*) WCBOE responds that: (1) it complied with the IDEA's eligibility requirements; (2) it did not predetermine C.A.'s placement at BHS; (3) both the 2015–2016 and 2016–2017 IEPs were reasonably calculated to allow C.A. to make educational progress in light of his circumstances; (4) C.A. and W.A. have failed to prove that C.A. required vision therapy, counseling, or OT to benefit from his education; (5) CIA was not an appropriate placement for C.A. under the IDEA; and (6) C.A.'s parents are not entitled to reimbursement for private medical services and evaluations. (Doc. No. 49.) WCBOE also objects to C.A. and W.A.'s reliance on Dr. Snow's deposition testimony and Dr. Noel's hearing testimony. (*Id.*) In their reply, C.A. and W.A. argue that these experts are credible and that WCBOE relied on them in crafting both IEPs; that WCBOE has not pointed to any evidence proving that C.A. could make educational progress outside of a small, structured learning environment; that CIA is an appropriate placement for C.A.; and that C.A.'s parents are entitled to reimbursement for the costs of CIA tuition and private medical services and evaluations. (Doc. No. 51.)

## II.     Legal Standard

The IDEA provides that a court reviewing an administrative determination "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(i)–(iii). "The

17

Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence, but also should give 'due weight' to the determinations made during the state administrative process." *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). The amount of weight due to a state agency's findings "will vary, depending on whether the court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings." *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 566 (6th Cir. 2000). When reviewing procedural issues, "a court should 'strictly review an IEP for procedural compliance,' although technical deviations will not render an IEP invalid." *Id.* (quoting *Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 800 (6th Cir. 1999)); *see also Deal*, 392 F.3d at 854 (same). With respect to substantive issues, courts "must keep in mind that the state and local educational agencies are deemed to possess expertise in education policy and practice." *Burilovich*, 208 F.3d at 567; *see also Rowley*, 458 U.S. at 207 ("The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child."). "As a result, less weight is due to an agency's determinations on matters for which educational expertise is not relevant, so that a federal court would be just as well suited to evaluate the situation[,]" while "[m]ore weight is due to an agency's determinations on matters for which educational expertise would be relevant." *Burilovich*, 208 F.3d at 567.

Courts reviewing administrative appeals under the IDEA engage in a two-part inquiry, first determining whether the school system has complied with the procedures set forth in the IDEA and then assessing whether an IEP developed through those procedures was reasonably calculated

18

to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206–07. "Parties challenging an IEP have the burden of proving by a preponderance of the evidence that the IEP devised by the school district is inappropriate." *Deal*, 392 F.3d at 854.

## III.     Analysis

C.A. and W.A. advance both procedural and substantive arguments regarding the 2015–2016 and 2016–2017 IEPs. Procedurally, C.A. and W.A. argue that WCBOE failed to classify C.A. with emotional disturbance and predetermined his placement at BHS for both IEPs, leading to substantive harm. (Doc. No. 50.) Substantively, C.A. and W.A. argue that the IEPs failed to provide C.A. with a FAPE because they did not provide small structured classes, vision therapy, and counseling. (*Id.*)

### A.     Compliance With IDEA Procedures Regarding Eligibility Classification and Placement

The procedural inquiry under the IDEA is an inquiry into "the process by which the IEP is produced, rather than [into] the myriad of technical terms that must be included in the written document." *Doe ex rel. Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990); *see also L.H.*, 900 F.3d at 789 ("Procedural violations generally concern 'the preparation of an IEP,' such as the evaluation, placement, and IEP-formation procedures outlined in [20 U.S.C.] § 1414." (quoting *Rowley*, 458 U.S. at 206)). "An important aspect in assessing procedural compliance is whether there was adequate parental involvement and participation in formulating an IEP" *L.H.*, 900 F.3d at 790 (citing *Renner v. Bd. of Educ. of Pub. Schs. of City of Ann Arbor*, 185 F.3d 635, 642 (6th Cir. 1999)); *see also Rowley*, 458 U.S. at 205–06 ("Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, *see, e.g.*, [20 U.S.C.] §§ 1415(a)–(d), as it did upon the measurement of the resulting IEP against a substantive standard."). "A finding of procedural

violations does not necessarily entitle [plaintiffs] to relief." *Deal*, 392 F.3d at 854. "[R]ather, a school district's failure to comply with the procedural requirements of the [IDEA] will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents." *Knable*, 238 F.3d at 765. "Substantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process" or "deprive an eligible student of an individualized education program or result in the loss of educational opportunity . . . ." *Id.* at 765–66.

C.A. and W.A. argue that, contrary to the ALJ's findings, a preponderance of the evidence shows that WCBOE violated the IDEA's procedural requirements with respect to C.A.'s eligibility classification and placement for the 2015–2016 and 2016–2017 school years and that these violations caused substantive harm, denying C.A. a FAPE.[5]

### 1.    Eligibility Classification

C.A. and W.A. argue that C.A. should have been classified with emotional disturbance as well as OHI for purposes of the 2015–2016 and 2016–2017 IEPs. The IDEA requires states to identify, locate, and evaluate "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services[.]" 20 U.S.C. § 1412(a)(3)(A). Eligible disability classifications under the IDEA include "intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious

---

[5]     WCBOE argues in a footnote that C.A. and W.A. "fail to assert that WCBOE predetermined placement for the 2016–2017 proposed IEP" and therefore "waive[d] any such claim." (Doc. No. 49, PageID# 4873 n.16.) However, C.A. and W.A.'s brief in support of their revised motion for judgment on the administrative record expressly argues that WCBOE "came into all of C.A.'s IEP meetings with the impermissible predetermination that he would attend a general education setting at BHS for the 2015–2016 and 2016–2017 school years, regardless of his individual needs at the time." (Doc. No. 50, PageID# 4962.) The Court will therefore consider whether WCBOE violated IDEA procedures regarding C.A.'s placement for both school years.

emotional disturbance (referred to . . . as 'emotional disturbance'), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities" that result in a child's need for "special education and related services." *Id.* § 1401(3)(A)(i)–(ii). However, the IDEA provides that "[n]othing in this chapter requires that children be classified by their disability so long as each child who has a disability listed in [20 U.S.C. § 1401(3)] and who, by reason of that disability, needs special education and related services is regarded as a child with a disability under this subchapter." *Id.* § 1412(a)(3)(B).

Children with eligible disabilities must be reevaluated "at least once every 3 years" and "not more frequently than once a year, unless the parent and the local educational agency agree otherwise[.]" *Id.* § 1414(a)(2)(B)(i)–(ii); *see also* 34 C.F.R. § 300.303(b)(1)–(2). Specifically, "[a] local educational agency shall ensure that a reevaluation of each child with a disability is conducted . . . if the local educational agency determines that the educational or related services needs . . . of the child warrant a reevaluation" or "if the child's parents or teacher requests a reevaluation." 20 U.S.C. § 1414(a)(2)(A)(i)–(ii); *see also* 34 C.F.R. § 300.303(a)(1)–(2).

In conducting evaluations and reevaluations, a local educational agency must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent[;]" "not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child;" and "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. § 1414(b)(2)(A)–(C). IDEA regulations require that, as part of any reevaluation, the IEP team must:

(1) Review existing evaluation data on the child, including—

(i) Evaluations and information provided by the parents of the child;

(ii) Current classroom-based, local, or State assessments, and classroom-based observations; and

(iii) Observations by teachers and related services providers; and

(2) On the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine—

(i)(A) Whether the child is a child with a disability, as defined in [30 C.F.R.] § 300.8, and the educational needs of the child; or

(B) In case of a reevaluation of a child, whether the child continues to have such a disability, and the educational needs of the child;

(ii) The present levels of academic achievement and related developmental needs of the child;

(iii)(A) Whether the child needs special education and related services; or

(B) In the case of a reevaluation of a child, whether the child continues to need special education and related services; and

(iv) Whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the IEP of the child and to participate, as appropriate, in the general education curriculum.

30 C.F.R. § 300.305(a).

Because the IDEA and federal and state regulations set forth procedures for determining a child's eligibility for special education and related services, this Court "'strictly review[s]'" compliance with those procedures. *Burilovich*, 208 F.3d at 566 (quoting *Dong*, 197 F.3d at 800); *Deal*, 392 F.3d at 854 (same).

### a.        2015–2016

Hendlmyer and Melson testified that the IEP team did not reevaluate C.A.'s eligibility classification before developing the 2015–2016 IEP and instead relied on C.A.'s 2013 initial eligibility classification of OHI. (Doc. No. 43-4, PageID# 1598–1600; Doc. No. 43-5, PageID# 1948–49; Doc. No. 43-7, PageID# 2282.) The administrative record shows that WCBOE assigned C.A. an eligibility classification of OHI on July 24, 2013. (Doc. No. 43-16,

PageID# 4767.) The ALJ determined that "C.A.'s [triennial] reevaluation was due July 24, 2016[,]" and that, because "C.A.'s eligibility was current when W.A. requested an IEP, [WCBOE] was not required to conduct a reevaluation in 2015." (Doc. No. 43-1, PageID# 938.) The ALJ further found that there was "no proof that W.A. or any of C.A.'s teachers requested an early reevaluation prior to the development of the 2015–2016 IEP." (*Id.*)

C.A. and W.A. argue generally that C.A. met the criteria for an emotional disturbance classification in both school years, but they have not challenged the ALJ's finding that WCBOE was not required to reevaluate C.A.'s eligibility classification before developing the 2015–2016 IEP. C.A. and W.A. have not pointed to any record evidence demonstrating that C.A.'s parents or any of C.A.'s teachers requested an early reevaluation or that WCBOE determined that C.A.'s educational or related service needs warranted an early reevaluation. The Court therefore finds, based on a preponderance of evidence, that WCBOE was not required to reevaluate C.A.'s eligibility classification before developing the 2015–2016 IEP. It therefore did not violate the IDEA's procedural requirements by failing to classify C.A. with emotional disturbance for the 2015–2016 IEP.

### b.     2016–2017

WCBOE conducted a triennial reevaluation of C.A. in 2016, finding that C.A. continued to meet the eligibility criteria for OHI based on his ADHD diagnosis and symptoms but did not meet the eligibility criteria for emotional disturbance. C.A. and W.A. argue that WCBOE's failure to classify C.A. with emotional disturbance in 2016 violated the IDEA because C.A.'s psychiatrists supported an emotional disturbance classification, the IEP team members agreed that C.A. exhibited characteristics of emotional disturbance, the 2016–2017 IEP included social/emotional behavioral goals, and the IEP team overlooked C.A.'s troubling behaviors at CIA. (Doc. No. 50.)

23

WCBOE responds that emotional disturbance was not an appropriate classification for C.A. because he was academically successful at CIA and there was a disconnect between his at-home behavior problems and his school-based success. (Doc. No. 49.) It further argues that C.A.'s clinical diagnoses alone are insufficient to show that an emotional disturbance classification was appropriate because they do not reflect whether C.A.'s mental health adversely affected his academic performance. (*Id.*) WCBOE also challenges the consistency of C.A.'s mental health treatment records. (*Id.*) Finally, WCBOE argues that failing to assign C.A. an emotional disturbance classification "had no impact on the services and supports offered to C.A. since he remained eligible for special education services as a student with an OHI." (*Id.* at PageID# 4892 n.35.)

IDEA regulations define emotional disturbance as follows:

(4)(i) Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) Emotional disturbance includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under paragraph (c)(4)(i) of this section.

34 C.F.R. § 300.8(c)(4)(i)–(ii).

The relevant Tennessee educational regulations provide a similar definition:

(8) "Emotional Disturbance" means a condition exhibiting one or more of the following characteristics to a marked degree that adversely affects a child's educational performance over an extended period of time (during which time documentation of informal assessments and interventions are occurring):

> (a) Inability to learn which cannot be explained by limited school experience, cultural differences, or intellectual, sensory, or health factors;

> (b) Inability to build or maintain satisfactory interpersonal relationships with peers and school personnel;

> (c) Inappropriate types of behavior or feelings when no major or unusual stressors are evident;

> (d) General pervasive mood of unhappiness or depression;

> (e) Tendency to develop physical symptoms or fears associated with personal or school problems.

> The term may include other mental health diagnoses. The term does not apply to children who are socially maladjusted, unless it is determined that they have an Emotional Disturbance. Social maladjustment includes, but is not limited to, substance abuse related behaviors, gang-related behaviors, oppositional defiant behaviors, and/or conduct behavior problems.

Tenn. Comp. R. & Regs. 0520-01-09-.02(8) (2016).

There is no dispute that C.A. displayed characteristics of emotional disturbance outside of the school environment. (Doc. No. 43-7, PageID# 2291.) The question before this Court is whether the emotional disturbance characteristics C.A. displayed adversely affected his educational performance such that WCBOE should have classified him with emotional disturbance during the 2016 triennial reevaluation.

Neither the IDEA nor its implementing regulations define the terms "adverse effect on educational performance[.]" *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 66 (2d Cir. 2000); *see also Q.W. ex rel. M.W. v. Bd. of Educ. of Fayette Cnty.*, 630 F. App'x 580, 582 (6th Cir. 2015). While states may choose "to give substance to these terms[,]" *J.D.*, 224 F.3d at 66, the relevant

Tennessee educational regulations do not, *see* Tenn. Comp. R. & Regs 0520-01-09-.02 (2016).[6] However, the Sixth Circuit held in *Q.W.* that, "[a]bsent a contrary directive" in state law, "'educational performance' may encompass more than academic achievement[,]" but "the plain meaning of 'educational performance' suggests school-based evaluation." 630 F. App'x at 582–83. Specifically, under *Q.W.*, educational performance means "the classroom and school experience—to the exclusion of social or behavioral deficits that were not shown to interfere with [a student's] school-based performance." *Id.* at 583.

The ALJ found that WCBOE "assessed C.A.'s social-emotional skills and academic achievement . . . using standardized assessments[;]" "obtained interviews and observations from multiple sources, including a phone interview with a CIA staff member, classroom teacher observation forms from C.A.'s math, English, ethics, Spanish, and chemistry teachers at CIA, and related service input from C.A.'s occupational therapist at CIA[;]" and "also considered the medical input from C.A.'s psychiatrist." (Doc. No. 43-1, PageID# 932, ¶¶ 23–25.) The ALJ further found that "[t]he IEP team determined that the data did not support that an [emotional disturbance] was causing an adverse impact on C.A.'s educational performance in his learning environment. Instead, C.A.'s teachers and parent reported that he was doing well in school except for a few difficulties with ADHD like behaviors." (*Id.* at PageID# 940–41.) The ALJ concluded that "C.A.'s clinical mental health disorders did not have an adverse impact on his educational performance"

---

[6]     The Tennessee regulations do provide a definition of "'[a]dverse affect'" as it applies to "'[i]ntellectually [g]ifted'" children, stating that "'[a]dverse [a]ffect' means the general curriculum alone is inadequate to appropriately meet the student's educational needs." Tenn. Comp. R. & Regs. 0520-01-09-.02(11) (2016). This definition does not appear to extend beyond the intellectually gifted context, and neither party has argued that it applies to emotional disturbance classifications.

and that "the IEP team properly determined that C.A. met the state criteria for an OHI and did not meet the state criteria for an [emotional disturbance]." (*Id.* at PageID# 941, 942.)

The IDEA expressly provides that "[n]othing in this chapter requires that children be classified by their disability so long as each child who has a disability listed in [20 U.S.C. § 1401(3)], and who, by reason of that disability, needs special education and related services is regarded as a child with a disability under this subchapter." 20 U.S.C. § 1412(a)(3)(B). In light of this provision, the Court finds that C.A. and W.A. have not carried their burden to show by a preponderance of the evidence that WCBOE violated IDEA procedures by declining to classify C.A. with emotional disturbance in addition to OHI during the 2016 reevaluation. *See Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th Cir. 1997) ("The IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [a student's] multiple disabilities."); *Pohorecki v. Anthony Wayne Loc. Sch. Dist.*, 637 F. Supp. 2d 547, 557 (N.D. Ohio 2009) ("The very purpose of categorizing disabled students is to try to meet their educational needs; it is not an end to itself."). There is no dispute that WCBOE regarded C.A. as a child with a disability under the IDEA as a result of the 2016 reevaluation based on his OHI classification; the fact that WCBOE did not also classify C.A. with emotional disturbance does not change its obligation to craft an appropriate IEP for C.A. based upon his educational needs. None of the authority on which C.A. and W.A. rely provides otherwise because, unlike this case, each case C.A. and W.A. cite involved a determination that a student was not disabled at all within the meaning of the IDEA. *See Muller ex rel. Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 103–04 (2d Cir. 1998); *M.M. v. N.Y.C. Dep't of Educ.*, 26 F. Supp. 3d 249, 256 (S.D.N.Y. 2014); *Eschenasy v. N.Y.C. Dep't of Educ.*, 604 F. Supp. 2d 639, 645–46 (S.D.N.Y. 2009); *N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 23–25 (D.D.C. 2008); *Pocono Mountain*

*Sch. Dist. v. T.D. ex rel. S.D.L.*, No. 3:15-CV-764, 2018 WL 3518464, at *1–2 (M.D. Pa. July 20, 2018), *aff'd in part, vacated in part*, 790 F. App'x 387 (3d Cir. 2019).

Further, even if C.A. and W.A. had shown that WCBOE's failure to classify C.A. with emotional disturbance was a procedural violation of the IDEA, they have not shown by a preponderance of the evidence that this failure caused substantive harm. They argue generally that WCBOE's "refusal to classify [C.A.] as [emotionally disturbed] resulted in IEPs that were deficient in the type of programs offered and the services provided." (Doc. No. 50, PageID# 4952.) But they have not pointed to any record evidence or legal authority to show a connection between the lack of an emotional disturbance classification and specific deficiencies in the 2016–2017 IEP. WCBOE continued to regard C.A. as a child with a disability based on his OHI classification and engaged in the IEP development process on that basis. *See Shafer v. Whitehall Dist. Schs.*, Nos. 1:10-cv-1170; 1:10-cv-1176, 2013 WL 1304920, at *10 (W.D. Mich. Mar. 28, 2013) (finding that school district's procedural violation with respect to one eligibility classification did not result in substantive harm where student remained eligible under three other classifications). Indeed, as C.A. and W.A. point out, the 2016–2017 final proposed IEP for C.A. included social/emotional behavior goals. (Doc. No. 43-8, PageID# 2526–27.) The Court therefore finds that C.A. and W.A. have not shown any substantive harm resulting from WCBOE's failure to classify C.A. with emotional disturbance during the 2016 reevaluation.

### 2. Placement

The IDEA's implementing regulations require that a disabled child's school placement: "(1) Is determined at least annually; (2) Is based on the child's IEP; and (3) Is as close as possible to the child's home[.]" 34 C.F.R. § 300.116(b)(1)–(3). "Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled[.]" *Id.* § 300.116(c). Further, "[i]n selecting the LRE, consideration is given to any

potential harmful effect on the child or on the quality of services that he or she needs[.]" *Id.* § 300.116(d).

C.A. and W.A. argue that WCBOE failed to base C.A.'s placement on his IEPs as required by the IDEA and instead predetermined C.A.'s placement at BHS before holding IEP meetings for the 2015–2016 and 2016–2017 school years. (Doc. No. 50.) C.A. and W.A. argue that these procedural violations caused substantive harm because they denied W.A. the opportunity for meaningful participation in the IEP process and limited the special-education and related services offered in C.A.'s IEPs to what was available at BHS. (*Id.*) WCBOE responds that it did not violate IDEA procedures regarding placement because the IEP team repeatedly revised the 2015–2016 draft IEP in response to W.A.'s input; kept an open mind about placing C.A. at CIA; and used C.A.'s home school, BHS, as the starting point in keeping with the IDEA's LRE provisions. (Doc. No. 49.)

The Sixth Circuit explained in *Deal v. Hamilton County Board of Education* that predetermination occurs when a school district pre-selects a particular program or school placement for a student regardless of any evidence regarding the student's individual needs. *See* 392 F.3d at 857–58. Predetermination constitutes a procedural violation of the IDEA because "[t]he relevant regulation provides that, in determining the educational placement of a disabled child, the public agency must ensure that the placement '[i]s based on the child's IEP[,]'" and "[a] placement decision may only be considered to have been based on the child's IEP when the child's individual characteristics, including demonstrated response to particular types of educational programs, are taken into account." *Id.* at 857, 859 (second alteration in original) (quoting 34 C.F.R. § 300.552 (2004)). A predetermination procedural violation causes substantive harm and deprives

the student of a FAPE if the student's parents are "effectively deprived . . . of meaningful participation in the IEP process[.]" *Id.* at 857.

However, the Sixth Circuit has also held that "predetermination is not synonymous with preparation." *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006). The IDEA and its implementing regulations allow "school evaluators [to] prepare reports and come [to IEP meetings] with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions.'" *Id.* (quoting *N.L. ex rel. Mrs. C. v. Knox Cnty. Schs.*, 315 F.3d 688, 694 (6th Cir. 2003)); *see also Deal*, 392 F.3d at 858 (discussing *N.L.*, 315 F.3d at 693–95). The parents' opportunity for "[p]articipation must be more than a mere form; it must be *meaningful*." *Deal*, 392 F.3d at 858; *see also Nack*, 454 F.3d at 610 (same). Courts therefore find substantive harm from a predetermination procedural violation where, based on a preponderance of the record evidence, "[t]he clear implication is that no matter how strong the evidence presented by the [parents], the [s]chool [s]ystem still would have refused to" depart from its predetermination. *Deal*, 392 F.3d at 858.

Because IDEA regulations set forth procedures for determining a disabled child's placement, this Court "'strictly review[s]'" compliance with those procedures. *Burilovich*, 208 F.3d at 566 (quoting *Dong*, 197 F.3d at 800); *Deal*, 392 F.3d at 854 (same).

The ALJ made the following findings in determining that WCBOE did not predetermine C.A.'s placement for the 2015–2016 school year:

> 13. After developing C.A.'s present levels of performance and goals, the IEP team discussed C.A.'s placement and determined that he could be served at his home school, BHS.

*      *      *

40. W.A. was afforded the opportunity to meaningfully participate in the development of both the 2015–2016 and 2016–2017 IEPs, and, in fact, WCS frequently amended the IEP to address W.A.'s concerns.

(Doc. No. 43-1, PageID# 931, 934 ¶¶ 13, 40.) The ALJ determined that "there was no predetermination" because "the IEP team discussed C.A.'s placement" "[a]fter developing C.A.'s present levels of performance and goals" "and determined that the IEP could be implemented at BHS." (*Id.* at PageID# 949.) The ALJ further found that the IDEA "mandate[s]" that "the IEP team's starting point is the child's home school" and that following this mandate "is not predetermination." (*Id.*)

The record makes clear that, from the outset, the IEP team framed discussions of C.A.'s IEP around the question of whether BHS could provide accommodations that would allow C.A. to maintain the academic success W.A. credited to the learning environment at CIA. Hendlmyer testified that she brought a draft IEP to the first IEP meeting on May 11, 2015 (Doc. No. 43-6, PageID# 2048), written "with [BHS] in mind because that's the less restrictive placement" (*id.* at PageID# 1989). Notes from the May 11, 2015 IEP meeting confirm that the draft was the team's "best guess of [the] IEP based on BHS . . . ." (Doc. No. 43-14, PageID# 3901.) The notes also reflect that W.A. requested that WCBOE place C.A. at CIA, including paying for the costs of his attendance, although W.A. later clarified that she had not made that request. (*Id.* at PageID# 3902; Audio Recording: IEP Meeting (May 13, 2015) (on file with the Court).) Notes from the May 13, 2015 IEP meeting show that the IEP team discussed transitioning C.A. from CIA to BHS while the team was still discussing C.A.'s current performance levels and goals. (Doc. No. 43-16, PageID# 4331.) Spangler testified that, "whenever we were given information about what [CIA] did, we always kind of provided [W.A.] with some options that were . . . very similar, if not the same, at [BHS]." (Doc. No. 43-6, PageID# 2160.) Hendlmyer testified that the team "discussed the least restrictive placement" "at the end of . . . the [July 7, 2015] meeting" and "decided that

31

[BHS] could provide all the services necessary for C.A., and I believe we discussed [CIA] as a possible placement and if there was any reason to consider an out-of-district placement." (Doc. No. 43-4, PageID# 1587.) The audio recording of the July 7, 2015 IEP meeting does not include that discussion or any discussion of placement. (Audio recording: IEP Meeting (July 7, 2015) (on file with the Court).)

"A school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement . . . because the [IDEA] requires that the placement be based on the IEP, and not vice versa." *K.D. ex rel. C.L. v. Dep't of Educ.*, 665 F.3d 1110, 1123 (9th Cir. 2011); *see also Spielberg ex rel. Spielberg v. Henrico Cnty. Pub. Schs.*, 853 F.2d 256, 259 (4th Cir. 1988) ("The defendants violated [IDEA] procedures when they resolved to educate [the student] at [one school], and then developed an IEP to carry out their decision."). Here, the IEP team's starting point was a draft IEP written for placement at BHS, and the IEP team's discussions included transitioning C.A. from CIA to BHS while the team was still evaluating C.A.'s present levels of performance and goals. The final IEP included direct special education services specific to the BHS curriculum and accommodations similarly tailored to what BHS could provide. And, although Hendlmyer testified that the team considered placement at CIA at the end of the last IEP meeting, the audio recording does not reflect any discussion of placement outside of BHS.

The ALJ's factual findings regarding the 2016–2017 IEP development process are as follows:

33.    In developing the 2016–2017 IEP, the team made changes to [C.A.'s] present levels and medical information based upon the updated information obtained.

34.    The team then amended and added to the IEP goals proposed for C.A. the previous year as needed based upon any changes in his present levels of performance.

35. The team proposed special education services in the special education setting for directed studies (48 mins. daily) and occupational therapy consultation (20 times per year/15 mins. per session) at BHS.

36. The IEP team discussed providing C.A. with more extensive special education services and supports to address the social-emotional behavioral concerns brought up by W.A.; however, W.A. rejected all the services offered.

37. Again, none of the data supported that C.A. needed counseling to be able to benefit from his special education. And again, the team discussed whether C.A. needed vision therapy; however, there was no indication that he required it to benefit from his special education services.

38. On August 4 , 2016, [WCBOE] proposed an IEP for C.A. for the 2016–2017 school year.

39. Again, W.A. refused to sign the IEP and unilaterally placed C.A. at CIA for the 2016–2017 school year, essentially barring [WCBOE] from providing these services to C.A.

40. W.A. was afforded the opportunity to meaningfully participate in the development of both the 2015–2016 and 2016–2017 IEPs, and, in fact, [WCBOE] frequently amended the IEP to address W.A.'s concerns.

(Doc. No. 43-1, PageID# 934, ¶¶ 33–40.) The ALJ did not separately analyze whether WCBOE predetermined C.A.'s placement for the 2016–2017 IEP.

Spangler testified that, at the first IEP meeting on July 22, 2016, the team presented a draft IEP that was unchanged from the final 2015–2016 IEP. (Doc. No. 43-6, PageID# 2098, 2101.) Again, the team framed its discussions as a comparison of BHS and CIA. W.A. told the IEP team that, if they could "come up with a really good IEP for [C.A.,]" he would transition to BHS. (Audio recording: IEP Meeting (July 22, 2016) (on file with the Court)). The comprehensive psychoeducational assessment Melson completed as part of C.A.'s 2016 triennial eligibility reevaluation states that "[C.A.] is currently enrolled at [CIA], although his parents are considering enrollment this year at [BHS]." (Doc. No. 43-11, PageID# 3212.) In an interview with C.A. on

August 1, 2016, Sheehan asked C.A. if he was "scared about [BHS]" and asked, "assuming you come here, what are you excited about?" (Doc. No. 43-14, PageID# 3999, 4001.)

As Dr. Navarre had recommended in the 2015–2016 IEP process, Dr. Snow submitted a medical information form to the IEP team recommending small, self-contained classes for C.A. like the ones available at CIA. (Doc. No. 43-11, PageID# 3228.) During the August 3, 2016 IEP meeting, W.A. asked if there were any special education classes at BHS where C.A. could be in a small group; Spangler responded that only students on a modified diploma path could be placed in smaller classes at BHS. (Audio Recording: IEP Meeting Part V (Aug. 3, 2016) (on file with the Court); Doc. No. 43-15, PageID# 4142.) W.A. also asked why the team thought small class sizes were not necessary for C.A. (Audio Recording: IEP Meeting Part VI (Aug. 3, 2016) (on file with the Court).) One team member responded that, because C.A. had never attended BHS, they were not able to determine that small class sizes were the reason that C.A. was doing well academically at CIA and also noted that C.A. had been academically successful at Brentwood Academy (which presumably had larger class sizes than CIA) before transferring to CIA. (*Id.*) Another team member responded that, at BHS, C.A. would have the option of leaving larger classrooms after direct instruction was complete and working in a smaller setting. (*Id.*)

The IEP team did not finalize C.A.'s eligibility reevaluation, present levels of performance, or goals until after the August 3, 2016 meeting; in the meantime, they discussed C.A.'s goals, accommodations, and related services based on the assumption that the 2016–2017 IEP would be implemented at BHS. For example, the newly added accommodation that, when direct classroom instruction concluded and teachers gave students the opportunity to work independently, C.A.'s teachers would use their discretion to direct C.A. to an appropriate work site was based on the assumption that C.A. would be enrolled in larger classes at BHS. (Audio recording: IEP Meeting

34

(July 22, 2016) (on file with the Court).) The only special education and related services offered to C.A. in the 2016–2017 IEP were OT consultations twenty times per year with Herman at BHS and the same directed study hall with a BHS special education teacher offered in the 2015–2016 IEP.[7] (Doc. No. 43-8, PageID# 2535.) At the conclusion of the August 3, 2016 IEP meeting, when the team reached the final page of the draft IEP regarding placement, a team member said: "we [a]re on the last one and, of course, Brentwood is [C.A.'s] home school. Questions?" (Audio Recording: IEP Meeting Part VI (Aug. 3, 2016) (on file with the Court).)

IDEA regulations and Sixth Circuit precedent are clear that a child's placement must be based on his or her IEP, not that an IEP be tailored to what a particular placement can provide to a child. *See* 34 C.F.R. § 300.116(b)(2); *Deal*, 392 F.3d at 857, 859; *Knable*, 238 F.3d at 763. Strictly reviewing the IEP process for procedural compliance, as it must, *see Burilovich*, 208 F.3d at 566, the Court finds by a preponderance of the evidence that that the IEP team tailored C.A.'s IEP to placement at BHS from its earliest discussions and, thus, improperly predetermined his placement for the 2015–2016 and 2016–2017 IEPs.[8] These procedural violations, however did not result in a substantive harm.

This case is distinguishable from *Deal*, in which (1) an IEP team member told the Deals that they could not ask questions during an IEP meeting; (2) another IEP team member told the Deals that "there were certain things she would like to give [their son] but that she could not

_____

[7]     On August 8, 2016, W.A. sent Hendlmyer a letter explaining that she was rejecting the 2016–2017 IEP because, among other reasons, C.A. needed one-on-one OT like what was provided at CIA, but Herman told W.A. "that [BHS] 'can't really provide that.'" (Doc. No. 43-15, PageID# 4142.)

[8]     While WCBOE and the ALJ relied on *Deal* for the proposition that complying with the IDEA's LRE provisions by using the child's home school as a starting point is not predetermination (Doc. Nos. 43-1, 49), *Deal* did not address a home school placement.

because she could not give the same service to everybody"; (3) the district "ha[d] consistently rejected providing" the service the Deals requested to the Deals' son "or any other student in their system"; (4) district "personnel informed the Deals that 'the powers that be' were not implementing" the type of service the Deals requested for their son; (5) an IEP team member "told the Deals that she wished people would pay their taxes so that [the district] could provide" the requested service for the Deals' son; and (6) the district had a policy of not even considering providing the requested service. *Deal*, 392 F.3d at 855–56. The record shows that W.A. had a meaningful opportunity to participate throughout the 2015–2016 and 2016–2017 IEP development processes. The IEP team actively included W.A. in its discussions, and W.A. had the opportunity to make objections and suggestions to drafts of the IEP, many of which were incorporated verbatim into the final document. *Cf. N.L.*, 315 F.3d at 694. The record does not show that WCBOE had a policy of refusing to consider placing students at private schools or in small classes if the IEP team determined that such placements were necessary. To the contrary, when W.A. asked the IEP team on August 3, 2016, why they thought C.A. did not need small classes, the IEP team members explained that, based on the available evidence, they were not convinced that small classes were necessary for C.A. to succeed academically. Unlike in *Deal*, no WCBOE representative or IEP team member ever suggested or stated that placing C.A. at CIA would be against district policy if that was what he needed.

The Court therefore concludes that, although WCBOE violated IDEA procedures by predetermining C.A.'s placement at BHS for the 2015–2016 and 2016–2017 IEPs, the violations did not result in substantive harm and C.A.'s parents are not entitled to recovery on that basis.[9]

---

[9]    C.A. and W.A. argue generally that WCBOE's predetermination violation caused substantive harm because it limited the accommodations and services in his IEPs to what was

## B. Substantive Adequacy

"The IEP is 'the centerpiece of the [IDEA]'s education delivery system for disabled children.'" *L.H.*, 900 F.3d at 788 (alteration in original) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). It is also "the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (quoting *Rowley*, 458 U.S. at 181). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999; *see also L.H.*, 900 F.3d at 789 (quoting *Endrew F.*, 137 S. Ct. at 1001). An IEP that offers "an educational program providing 'merely more than *de minimis*' progress from year to year" will not satisfy this standard. *Endrew F.*, 137 S. Ct. at 1001. However, in reviewing an IEP, a court "must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 999. "[F]or a child fully integrated in the regular classroom, an IEP typically should . . . be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Id.* (quoting *Rowley*, 458 U.S. at 204).

The ALJ found that "[t]he evidence shows that C.A.'s IEPs were substantively appropriate and were designed with his unique capabilities in mind for the purpose of providing him with access to educational services that were reasonably calculated [to] enable him to achieve passing marks and advance from grade to grade." (Doc. No. 43-1, PageID# 945.) Specifically, the ALJ found that, with respect to the 2015–2016 IEP, WCBOE "took C.A.'s individual needs into consideration and developed an IEP that was reasonably calculated to enable C.A. to make

available at BHS. (Doc. No. 50.) The Court will separately address whether the IEPs were substantively adequate.

progress appropriate in light of his circumstances." (*Id.* at PageID# 946.) Regarding the 2016–2017 IEP, the ALJ found that W.A. and C.A. "failed to prove that the proposed IEP was not reasonably calculated to provide C.A. with an educational benefit." (*Id.* at PageID# 951.) Because these findings concern substantive issues for which educational expertise is relevant, the Court must afford due weight to the ALJ's determinations. *See Burilovich*, 208 F.3d at 566–67.

C.A. and W.A. argue that the 2015–2016 and 2016–2017 IEPs were not reasonably calculated to allow C.A. to make appropriate educational progress because they did not provide: (1) a small supportive environment; (2) counseling; and (3) vision therapy.[10] (Doc. No. 50.) Because C.A. and W.A. have failed to carry their burden with respect to these arguments, they have not shown that WCBOE denied C.A. a FAPE. The Court therefore does not need to consider whether CIA was an appropriate placement under the IDEA to find that C.A.'s parents are not entitled to reimbursement for the costs of CIA tuition or private OT, vision therapy, counseling, and evaluations.

### 1.    Small Supportive Environment

C.A. and W.A. argue that evidence from Dr. Navarre, Dr. Noel, Dr. Underwood, Dr. Snow, and Dr. Salsberg demonstrates that the 2015–2016 and 2016–2017 IEPs were substantively deficient because they did not provide for C.A. to be educated in a small supportive environment. (Doc. No. 50.)

---

[10]    These are the only three substantive, as opposed to procedural, arguments that C.A. and W.A. develop in the argument section of their revised brief. (Doc. No. 50.) While C.A. and W.A. allude to additional substantive arguments in the factual background section of their revised brief, the Court declines to consider arguments only raised in a perfunctory manner. *See United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones." (alteration in original) (quoting *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009))).

Dr. Navarre testified that "a combination of different factors . . . made it difficult for [C.A.] to be successful in . . . a traditional educational setting because of his difficulty with focus and completing work and being able to make decisions and follow through with them and then be able to course correct." (Doc. No. 43-2, PageID# 1159.) He also testified that C.A. would "do better both academically" and "developmentally" "if he was able to be educated in a very structured, predictable environment where he would have fewer contextual demands so that it would be easier for him to be successful[.]" (*Id.* at PageID# 1160.) Dr. Navarre expressed concern that C.A. "would not have been able to be successful in . . . a traditional environment and that things would have gotten much worse." (*Id.* at PageID# 1161.) He testified that "[i]t was because of [the CIA] setting that [C.A.] was able to do well, although he still continued to need a lot of support even in that setting." (*Id.* at PageID# 1163; *see also id.* at PageID# 1182.) Dr. Navarre further testified that, based on his professional experience and C.A.'s "ongoing difficulties when he already had a small class size," C.A.'s difficulties "would be only worse if he didn't have a small class size." (*Id.* at PageID# 1187.)

Dr. Noel testified, based on her observation of C.A. at CIA, that the learning environment at CIA was "an environment in which C.A. [was] likely to be set up for success" due in part to "the small class size[s.]" (Doc. No. 43-2, PageID# 1017.) Dr. Noel also observed classes at BHS and testified that "there were no co-teachers in those classes"; that a teacher in one class she observed "was engaging and reviewing high level interesting topics, but he never redirected those students that I saw that were off task the entire time"; and that, "[k]nowing somebody like C.A. who needs to be on task[,] . . . I would want to see a teacher that was redirecting and making sure that students were staying on task." (*Id.* at PageID# 1029.) Dr. Noel's BHS observation notes state that C.A. "needs a setting in which the expectation is clear of where [he] will be at all points during

the school day, as opposed to a loose structure of being able to come and go into classrooms." (Doc. No. 43-8, PageID# 2459.)

Dr. Underwood testified that he worked with CIA staff to coordinate incentives and disciplinary measures for C.A., specifically "how to use athletics as a motivation and not as punishment." (Doc. No. 43-3, PageID# 1334.) Dr. Underwood also testified that C.A. had made progress regarding his mental health issues, and that Dr. Underwood "believe[d] his progress [was] from his consistency with [CIA] and the consistency with his mentors at the school." (*Id.* at PageID# 1337–38.)

Dr. Snow submitted a medical evaluation form to the 2016–2017 IEP team stating that C.A.'s ADHD and "mood disorder required small-group instruction" and that C.A.'s "psychiatric [and] educational needs appear intertwined[.]" (Doc. No. 43-11, PageID# 3228.)

Dr. Salsberg testified that, "without a doubt[,] [C.A.] needed an environment that addressed the range of his attention and impulsivity . . . together with all the emotional vulnerabilities, the self-image, the self-esteem, the anxiety, how that manifests in large classes, . . . being singled out with interventions as opposed to being more comprehensive as part of a program" and that "all of those things were things that . . . weren't given to [C.A.]" in the IEPs. (Doc. No. 43-4, PageID# 1468.)

C.A. and W.A. argue that this evidence satisfies the preponderance of the evidence standard to show that the 2015–2016 and 2016–2017 IEPs were substantively deficient under the IDEA because they did not provide a small supportive learning environment for C.A. (Doc. No. 50.) The Court does not reach the same conclusion. While the evidence supports a finding that CIA may have been the ideal placement for C.A., C.A. and W.A. have not shown that the 2015–2016 and

2016–2017 IEPs were not reasonably calculated to enable C.A. to make appropriate progress in light of his circumstances. *See Endrew F.*, 137 S. Ct. at 999.

The 2015–2016 IEP noted that C.A.'s social/emotional behavior was exceptional and that C.A. "does better with more monitoring and a smaller setting around adults who have an understanding of his behavior and his mood/anxiety problems." (Doc. No. 43-8, PageID# 2481.) The IEP therefore provided that C.A.'s social/emotional behavior "should be monitored and addressed to ensure continued success in the academic environment." (*Id.*) The 2015–2016 IEP included accommodations providing C.A. with the opportunity "to take his tests in a flexible setting (individual, small group, designated part of room, study carrel, other classroom, etc.)"; "[p]lanned/[p]referential seating to reduce and minimize distractions"; and the option to request "short breaks during assessments and class instruction." (*Id.* at PageID# 2490.) It further provided that C.A.'s "Directed Study teacher [would] check in with him daily to assess his academic progress, monitor his work completion, provide remediation as needed, and assist [C.A.] in preparing for upcoming assessments." (*Id.* at PageID# 2493.) The 2015–2016 IEP also provided C.A. with a paraprofessional in the inclusion lifetime wellness class to mitigate its large size. (*Id.* at PageID# 2497.)

The 2016–2017 IEP similarly noted that, according to Dr. Navarre, C.A. "does better with more monitoring and a smaller setting around adults who have an understanding of his behavior and his mood/anxiety problems." (*Id.* at PageID# 2503.) It noted that C.A.'s social/emotional behavior was exceptional; that he "struggle[d] with inattention at times and can get overwhelmed with more complex/difficult material, which may result in [him] shutting down"; and that his "negative behaviors . . . should be monitored and addressed to ensure continued success in the academic environment." (*Id.* at PageID# 2517.) The 2016–2017 IEP noted that C.A.'s "low

sensory registration can affect his ability to attend to a given task, which means that he will probably perform better in an environment with fewer distractions and background stimulation." (*Id.* at PageID# 2519.) The IEP further provided that C.A.'s student support services "teacher will collaborate and consult with his general education teachers using peer-reviewed research practices to the greatest extent practicable" and that "OT [will] consult and provide adequate sensory supports for [C.A.] in [the] school setting and help with self-regulation." (*Id.* at PageID# 2526.) The 2016–2017 IEP included an accommodation that, "[w]hen direct instruction has concluded [in academic classes] and students are given the opportunity to work independently, [C.A.'s] teacher will use his/her discretion to direct him to an appropriate work site in order to maximize his opportunities for success." (*Id.* at PageID# 2529.) Other accommodations included the opportunity "to take his tests in a flexible setting (individual, small group, designated part of room, study carrel, other classroom, etc.)"; "[p]lanned/[p]referential seating to reduce and minimize distractions"; and the option to request "short breaks during assessments and class instruction." (*Id.*) The 2016–2017 IEP again provided that C.A.'s "Directed Study teacher will check in with him daily to assess his academic progress, monitor his work completion, provide remediation as needed, and assist [C.A.] in preparing for upcoming assessments." (*Id.* at PageID# 2532.)

Considering the record evidence and giving due weight to the ALJ's findings, the Court finds that C.A. and W.A. have not carried their burden to show by a preponderance of the evidence that the 2015–2016 and 2016–2017 IEPs were unreasonable because they failed to provide a sufficiently small and supportive learning environment. The record shows that the IEP team considered C.A.'s unique individual needs, including input from his doctors, and specifically designed the IEPs to enable C.A. to make appropriate progress in light of his circumstances. *See Endrew F.*, 137 S. Ct. at 999.

C.A. and W.A.'s arguments to the contrary are unpersuasive. C.A. and W.A. cite *S.H. v. Rutherford County Schools*, 334 F. Supp. 3d 868 (M.D. Tenn. 2018), in support of their argument that the "IEP team should not have dismissed C.A's doctors' professional advice so readily." (Doc. No. 50, PageID# 4953.) But *S.H.* is readily distinguishable from this case. In *S.H.*, the district court found that the ALJ improperly discounted medical opinions in the record where the ALJ ruled from the bench, only discussed the IEPs in a "'general and conclusory'" way, "'appear[ed] to assume that the content of each IEP was appropriate[,]'" and issued "a 2-page Final Order dismissing the case[.]" 334 F. Supp. 3d at 873 (citation omitted). The district court found that "it [was] unclear whether the ALJ considered any of the 1,500 pages of exhibits in the administrative record, including the IEPs," *id.* at 874, and further found that the plaintiffs provided sufficient evidence to satisfy the preponderance of the evidence standard and show that the IEPs in question were substantively inadequate. *See id.* at 875. Those are not the circumstances here. The ALJ issued a thorough written opinion addressing the record evidence, and C.A. and W.A. have not pointed to sufficient evidence to show that the IEPs were substantively inadequate.

C.A. and W.A. further argue that WCBOE "never squarely addresses how its proposed program—in a large high school, with a much larger student-to-teach ratio, and without the imbedded supports C.A. had been receiving at [CIA]—would result in C.A.'s progress in light of his psychological and academic struggles." (Doc. No. 51, PageID# 4981.) This argument misconstrues the standard on appeal. It is C.A. and W.A.'s burden to show by a preponderance of the evidence that the IEPs in question were inappropriate. *Deal*, 392 F.3d at 854. Further, as explained, the 2015–2016 and 2016–2017 IEPs included supports designed to address C.A.'s individual needs.

### 2. Counseling

C.A. and W.A. argue that "the record evidence supporting C.A.'s need for counseling was overwhelming, . . . the reason that his IEP teams declined to recommend counseling was flawed[,]" and that the 2015–2016 and 2016–2017 IEPs were therefore substantively deficient because they failed to provide C.A. with counseling. (Doc. No. 50, PageID# 4958.) In support of these assertions, C.A. and W.A. string cite more than 600 pages of record evidence and more than 30 hours of IEP meeting recordings without any description or explanation of what the Court should find there to support C.A. and W.A.'s arguments. (*Id.* at PageID# 4958–59.)

Courts may decline to consider evidence cited without any appropriate explanation of its significance because "it is not in the Court's purview to manufacture a party's theory of the case." *Knight Cap. Partners Corp. v. Henkel AG & Co., KGaA*, 930 F.3d 775, 780 n.1 (6th Cir. 2019). It was C.A. and W.A.'s "job to point to the evidence with specificity and particularity in the relevant brief rather than just dropping a pile of paper on the [Court's] desk and expecting [the Court] to sort it out." *Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010); *see also ECIMOS, LLC v. Nortek Glob. HVAC, LLC*, 736 F. App'x 577, 585 (6th Cir. 2018) ("[I]t is [a party's] burden to . . . make the argument because '"[j]udges are not like pigs, hunting for truffles" that might be buried in the record.'" (third alteration in original) (quoting *Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011))).

The Court therefore finds that C.A. and W.A. have failed to carry their burden to show by a preponderance of the evidence that the 2015–2016 and 2016–2017 IEPs were substantively deficient because they failed to provide C.A. with counseling services.

### 3. Vision Therapy

Under the IDEA, a FAPE includes both "special education and related services . . . ." 20 U.S.C. § 1401(9). "Related services" include, among other things, "developmental, corrective, and

other supportive services" like "speech-language pathology and audiology services . . . as may be required to assist a child with a disability to benefit from special education[.]" *Id.* § 1401(26)(A); *see also* 34 C.F.R. § 300.34(a) ("Related services means transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education[.]"). Vision therapy may qualify as a related service. *See, e.g.*, *Cobb Cnty. Sch. Dist. v. A.V. ex rel. W.V.*, 961 F. Supp. 2d 1252, 1273 (N.D. Ga. 2013) (finding "a preponderance of evidence to support the ALJ's conclusion[ ] that vision therapy was a related service necessary for A.V. to receive a FAPE").

The ALJ made the following findings in determining that C.A. did not require vision therapy as a related service in order to receive a FAPE for the 2015–2016 and 2016–2017 school years:

- "[In 2015,] Melson followed up by phone interview with C.A.'s prior vision therapist . . . and shared that information with W.A. and the IEP team" (Doc. No. 43-1, PageID# 930, ¶ 6);

- "The [2015–2016 IEP] team discussed whether C.A. needed vision therapy . . . and determined he did not require [it] to benefit from his special education services . . . . There was never any indication that C.A. needed vision therapy" (*id.* at PageID# 931, ¶ 17);

- "[T]he [2016–2017 IEP] team discussed whether C.A. needed vision therapy; however, there was no indication that he required it to benefit from his special education services" (*id.* at PageID# 934, ¶ 37).

C.A. and W.A. argue that, contrary to the ALJ's findings, "vision therapy was necessary for C.A. to receive a FAPE." (Doc. No. 50, PageID# 4960.) In support of their argument, C.A. and

W.A. cite and discuss record evidence from Dr. Danley and Sprocket Therapy Solutions. (Doc. No. 50.)

Dr. Danley, who is a board-certified developmental optometrist, evaluated C.A. in September 2015. (Doc. Nos. 43-2, 43-8, 43-9.) Dr. Danley "performed a developmental vision evaluation, . . . evaluating [C.A.'s] eye teaming, his focusing, his visual acuity, and also looked at how he was processing visual information." (Doc. No. 43-2, PageID# 1098.) To evaluate C.A.'s visual processing, Dr. Danley tested "seven different visual perceptual skills." (*Id.* at PageID# 1099.) Dr. Danley testified that C.A.'s "testing indicated . . . that aside from spatial relations in which he scored in the 63rd percentile of his age, he scored below 50th percentile or below average or . . . low average in all of the other skills of visual perception." (*Id.* at PageID# 1099–1100.) She further testified that C.A. "would avoid tasks" that involved "any concepts that [were] coming in through the eyes, [because] it would take [him] longer to understand these things[.]" (*Id.* at PageID# 1101.) Dr. Danley diagnosed C.A. with "Accommodative Dysfunction", "Binocular Vision Dysfunction", and "Visual Information Processing Deficits" and prescribed "6 months [of] weekly in-office therapy combined with home reinforcement activities." (Doc. No. 43-8, PageID# 2658.) About midway through C.A's vision therapy, W.A. provided Dr. Danley with a list C.A. had written describing some of the challenges he experienced. (Doc. No. 43-2.) The list included the following complaints, among others:

- Reading is extremely hard for me

- Takes several minutes just to read one page

- Don't even remember what I just read

- Get frustrated

- I hate reading so much

- Spelling is also extremely hard for me

46

- Mix up letters all the time

- Sometimes put numbers in for letters

- Can't stay focused

- Very hard to just spell word just in general

                    *        *        *

- Trouble copying

- Zone out all the time

                    *        *        *

(Doc. No. 43-10, PageID# 3019.) Dr. Danley testified that, based on her evaluation and treatment of C.A., she believed that C.A.'s visual deficiencies impacted his academic abilities. (Doc. No. 43-2.)

Dr. Danley also referred C.A. to Sprocket Therapy Solutions for an OT assessment. (Doc. No. 43-8.) Sprocket evaluated C.A. in October 2015 and administered the Beery VMI, which is a developmental test of visual motor integration. (*Id.*) C.A. scored below the first percentile in both overall visual motor integration and motor coordination. (Doc. Nos. 43-2, 43-8.) Dr. Danley testified that these results showed that C.A. was "scoring or performing on this particular test at about the level of a 7-year-old[.]" (Doc. No. 43-2, PageID# 1119.) Dr. Danley also testified that C.A. "responded very nicely to therapy." (*Id.* at PageID# 1102.) Dr. Danley reassessed C.A. "after three months, about 12 visits, and he had gained all the skills that [she] would have expected him to in terms of his functional skills . . . and then after three more months, he had improved all of the perceptual skills . . . to average or above average." (*Id.* at PageID# 1102–03.)

The 2015–2016 IEP team presented W.A. with a final proposed IEP on July 7, 2015. (Doc. No. 43-8, PageID# 2467.) The record shows that, in November 2015, W.A. provided Hendlmyer, Spangler, Melson, and Williams with copies of Dr. Danley's and Sprocket's evaluations. (Doc.

47

No. 43-14, PageID# 3944.) C.A. and W.A. argue that the IEP team "neither convened a meeting during the 2015–2016 school year to consider the evaluations nor performed their own testing." (Doc. No. 50, PageID# 4961.) But C.A. and W.A. have not presented any authority to support a finding that WCBOE was obligated to convene another IEP meeting or perform its own testing under these circumstances, and WCBOE argues that it was not. The record evidence shows that C.A. was not receiving vision therapy while W.A. and the IEP team developed the 2015–2016 IEP, and the team found that C.A.'s visual processing difficulties could "be appropriately addressed through individualized accommodations." (Doc. No. 43-8, PageID# 2468.) To that end, the 2015–2016 IEP provided C.A. with accommodations including not penalizing spelling errors, giving C.A. extra white space on assignments and assessments as needed, allowing C.A. extra time to complete assessments, and providing him with copies of any notes or materials to be copied from the board. (*Id.* at PageID# 2490.) Consequently, the Court finds that C.A. and W.A. have not carried their burden to show, by a preponderance of the evidence, that the 2015–2016 IEP was not reasonably calculated to allow C.A. to make appropriate progress in light of his vision-related needs.

C.A. and W.A. further argue that the 2016–2017 IEP denied C.A. a FAPE because it failed to include vision therapy as a related service. W.A. and the IEP team developed the 2016–2017 IEP between July 22 and August 4, 2016. The record shows that, at that time, C.A. had already completed the prescribed six months of vision therapy with Dr. Danley, who testified that "all of [C.A.'s] perceptual skills[ ] had improved to average or above average." (Doc. No. 43-2, PageID# 1102–03.) The 2016–2017 IEP again included accommodations not penalizing C.A.'s spelling errors, providing C.A. with extra time and white space on assessments and assignments, and giving him copies of any notes or material to be copied from the board. (Doc. No. 43-8,

PageID# 2529.) Considering the record evidence and the parties' arguments, the Court finds that C.A. and W.A. have not carried their burden to show by a preponderance of the evidence that the 2016–2017 IEP was not reasonably calculated to allow C.A. to make appropriate progress in light of his circumstances because it failed to include vision therapy services.

## IV.     Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that C.A. and W.A.'s revised motion for judgment on the record (Doc. No. 50) be DENIED and that the ALJ's decision be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 31st day of August, 2021.

ALISTAIR E. NEWBERN
United States Magistrate Judge